[No. 3,685.]

## IN THE MATTER OF JOHN J. MARKS.

ACT TO PREVENT EXTORTION OR NEGLECT IN OFFICIAL DUTIES.—The Act entitled "an Act to prevent extortion in office and to enforce official duty," approved March 14th, 1853, was designed to afford a remedy of a summary character against officeholders who were guilty of extortion or of neglect in the performance of official duties.

NEGLECT OF OFFICIAL DUTY.—A State Harbor Commissioner who corruptly consents to leasing wharves belonging to the State for less than the real value of their rental, and who, in consideration thereof, receives from the lessee a sum of money, or who directs the employés of the Board of Harbor Commissioners to neglect to keep accounts of money collected by them from rent of wharves, and to pay a portion thereof over to him, or to buy silver plate for him with the same, or who appoints wharfingers on the recommendation of a third person on an agreement that such third person will recommend customers to trade at the Commissioner's store, or who votes to contract with a person to dredge the harbor, without advertising for bids, in consideration of receiving a portion of the money paid for dredging from the person who performs the same, or who favors employing persons to perform any work on the wharves in consideration of receiving from such persons a portion of the money paid them therefor, or who instructs wharfingers to collect from vessels the full sum for dockage but to retain and pay over to him a portion thereof and not account to the State therefor, is guilty of neglect in the performance of official duty, within the meaning of the Act approved March 14th, 1853, entitled "an Act to prevent extortion in office and to enforce official duty."

REPEAL OF ACT RELATING TO EXTORTION AND NEGLECT IN OFFICE.— The Act of March 14th, 1853, entitled "an Act to prevent extortion in office and to enforce official duty" has not been repealed.

WHO MAY SUE FOR EXTORTION IN, OR NEGLECT OF, OFFICE.—Any private citizen may make complaint to the District Court against an officer for extortion in, or neglect of, official duties, under the Act approved March 14th, 1853.   (Laws 1853, p. 40.)

JURISDICTION OF DISTRICT COURTS.—The District Courts have jurisdiction of an action commenced under the Act of March 14th, 1853, to pre-

vent extortion in office and to enforce official duty, and the County Courts have not jurisdiction of such actions.

JURISDICTION IN "SPECIAL CASES."—The Constitution has left to the legislative will to determine whether jurisdiction over any given special case shall be vested in the County Court or some other Court.

MANNER OF IMPEACHING FOR MISDEMEANOR IN OFFICE.—While the Constitution has provided that the Governor, Lieutenant Governor, Secretary of State, Controller, Treasurer, Attorney General, Surveyor General, Justices of the Supreme Court, and District Judges, shall be impeached by the Assembly and tried by the Senate, it has left all other civil officers to be tried for misdemeanor in office in such manner as the Legislature may provide.

APPEAL from the District Court of the Nineteenth Judicial District, City and County of San Francisco.

The complaint averred that the complainant was a citizen and taxpayer of the State of California. The complaint was filed January 20th, 1873, and it alleged that Marks' term of office as Harbor Commissioner was four years from the 6th day of December, 1869; and that the office of State Harbor Commissioner was an office provided for and created by the terms of an Act of the Legislature entitled "an Act to provide for the improvement and protection of the wharves, docks, and water front of the City and County of San Francisco," approved March 14th, 1863; and that the duties of said Board, among other things, were to collect such rents, tolls, wharfage, craneage, and dockage as should be fixed under said Act, and to disburse and dispose of the revenue arising therefrom as in said Act provided; and that the said John J. Marks knowingly, willfully, and corruptly refused and neglected to discharge his said duty as a member of said Board of State Harbor Commissioners; and that he willfully and corruptly conspired and colluded with Jasper O'Farrell, likewise a State Harbor Commissioner and member of said Board, the two constituting a majority thereof; and did control, influence, and direct its action so as to cause said Board to so manage the affairs of said Commission that the said revenue arising from said rents, tolls, wharfage, craneage,

and dockage should not be disbursed and disposed of according to law and said Act of the Legislature, but should be fraudulently appropriated to their own proper use and benefit, and especially to the use and benefit of said John J. Marks. That heretofore, to wit: on the 1st day of June, 1872, at said city and county, the said Board of Harbor Commissioners resumed possession of Broadway wharf, a wharf of the property of the State, and under the control of said Board, and before that time under lease to the Central Pacific Railroad Company, for the purpose of ascertaining its actual value, with the view of reletting it to said railroad company; that said Marks was, at the time above named, Harbor Commissioner as aforesaid, and acted officially in said Board in favor of said proceeding, causing and influencing the same by his official vote and action to be done; that upon the said order being passed the Board, the said Marks undertook, in his official capacity as State Harbor Commissioner, to cause the same to be carried out; and that, in that behalf, he ordered the acting collector of said wharf, John Buchanan, to collect the tolls of said wharf during said month of June, 1872, and to pay the tolls so collected, day by day as fast as collected, to Charles Callaghan, then an employé of said Board. And further, that the said Marks then and there, acting in his official capacity as State Harbor Commissioner, directed the said Charles Callaghan to receive said tolls from said Buchanan, and to cause false and fraudulent reports and returns to be made to the office of the State Harbor Commissioners concerning the same, concealing the real amount of tolls so collected; and the said Marks then and there directed the said John Buchanan and the said Callaghan so to make such false and fraudulent reports and returns.

And the complaint further charged that the said John Buchanan, acting under the orders of said John J. Marks,

collected the tolls at said wharf for said month, and that the same amounted to the sum of nine hundred and seventy-eight dollars, which sum was of the moneys of the State, and that, acting under said Marks' orders, only five hundred and twenty-six dollars and seventy-five cents of said sum was paid over to the State by said Buchanan, or by any one whomsoever, but that the balance, to wit: the sum of four hundred and fifty-one dollars and twenty-five cents, was received and taken from the said John Buchanan by the said Charles Callaghan, acting under said Marks' orders, and was afterwards, to wit: on the day last given aforesaid, by the said Charles Callaghan, paid over to Thomas Marks, the son and duly authorized agent of the said John J. Marks, for the use of the said John J. Marks, and that the same was afterwards, to wit: on the day and year aforesaid, by said Thomas Marks, duly delivered to his said father, John J. Marks, and by him converted to his own use. That no part of said last named sum of four hundred and fifty-one dollars and twenty-five cents has ever been accounted for or paid to the State Treasury, as required by law.

And the complaint further charged that the hereinabove recited transaction at and relating to the said Broadway wharf was done the better to enable said Marks to influence and cause said Board to make a corrupt contract of lease of said wharf to said Central Pacific Railroad Company, and that the same was afterwards, to wit: on the 1st day of July, 1872, by said Board, under and by the official influence and action of said Marks, made and entered into with said railroad company.

That at the city and county aforesaid, to wit: on or about the 1st day of July, 1872, Broadway wharf, of the property of the State under control of said Board, was let by said Board to the Central Pacific Railroad Company, as tenants, from month to month, at the monthly rent of five hundred

dollars per month, a sum which was then, and ever since hath been, greatly less than the true monthly value of said wharf. That said wharf was then and there, and hath ever since been and now is, worth the just and full sum of two thousand dollars per month, which fact the said John J. Marks well knew. But that in refusal and neglect of his duty he voted and officially acted in said Board in favor of making said lease, thereby causing the same to be made at said inadequate sum of five hundred dollars per month. That he was moved to his said action by a corrupt and secret understanding with said railroad company; that he, the said John J. Marks, was to be paid for his said action the sum of two thousand five hundred dollars cash in hand.

And the complaint further alleged that the said John J. Marks was afterwards, to wit: on the day and year aforesaid, paid by said company, in pursuance of said before mentioned secret agreement, the said sum of two thousand five hundred dollars, which he appropriated to his own use, in violation of his duty and against the law.

There were other charges of a similar nature with regard to leasing Washington street wharf to Goodall & Nelson, and the bulkhead on East street to Turner & Harvey, the Greenwich dock to Green & Searles, and Cowell's wharf to Edwards & Sage, and the wharf on East street to Thomas & Drake.

The complaint also averred that it was the duty of said Board to employ suitable wharfingers and collectors, and to require of them to keep a correct account of moneys collected, and to pay over such moneys once a week, and that Marks, in collusion with O'Farrell, caused the Board to neglect and refuse to do so, and caused the Board to appoint improper persons, and caused the Board to refuse and neglect to require said appointees to keep any account, or to pay over the money by them collected once a week, or at any time; and that Marks caused the employés to expend the

moneys by them collected without vouchers or check, in making repairs on wharves, etc.

That said Marks caused an assessment to be levied on all the wharfingers and collectors, to make up a fund of ten thousand dollars to be paid to him; and that said wharfingers and collectors, by direction of Marks, paid said assessments to Marks out of money collected by them of the revenues of the wharves of which they were collectors.

That said Marks also caused said wharfingers and collectors, out of the money collected by them, to buy him a set of silver plate, at a cost of nine hundred dollars.

That it was the duty of said Board to cause the docks and slips to be dredged, and to award a contract therefor to the lowest bidder, after advertising the same, and that Marks made an agreement with one Black to do said dredging at thirty-four cents per cubic yard, when it was worth only twenty-five cents per yard, and the contract was let to Black without any advertisement, and Marks received from Black ten per cent of the gross proceeds of the dredging.

There was a similar charge with regard to a contract with Boobar and Richardson about driving piles.

That Marks influenced the Board to require the wharfingers and collectors to charge full sums to vessels for wharfage and dockage, but to retain one third of the amount to pay assessments laid by Marks, and to return to the Board a sum less than that collected.

The plaintiff appealed.

The other facts are stated in the opinion.

*John F. Swift*, for Appellant.

The framers of the Constitution, possibly in view of the great power that might be exercised by the higher State officers at times, to menace or overawe the ordinary tribunals, provided a Court of impeachment for them, which, however, is not in any sense exclusive, but is only cumula-

tive. It also extends to the high judicial authorities as well. But this provision only extends to the higher of the constitutional officers, and notably omits a portion of them. It then provides that all other civil officers shall be tried for misdemeanors in office in such manner as the Legislature shall provide. (Const. Art. IV, Sec. 19.)

The Act under which this suit has been brought, is reënacted in substance (Penal Code, Sec. 772), showing the opinion of the legislative department, at least, that the District Courts had jurisdiction of the subject of removing officers for misconduct.

It is urged for respondent that this proceeding cannot be allowed in the District Court, because of the wording of the Constitution in defining the jurisdiction of those Courts; because, this is not an equity case, nor a case at law involving the title or possession of property, etc; nor was the value of the property in controversy, exclusive of interest, etc., above three hundred dollars. And that, further, because of the fact that the County Court alone has jurisdiction under the clause concerning "special cases" not otherwise provided for.

Against this action we will first show how it would stand at common law.

This is an action instituted for the purpose of ousting a State officer from his office for willful and corrupt violation of duty. That it is a principle as old as the common law that neglect or violation of official duty forfeits the office, and that the Court will take cognizance of and enforce the forfeiture.

It is laid down at common law that an office is forfeited if the officer break the condition of his office by *non user* or *abuser*. (9 Coke, 95 A; 5 Comyn's Dig., Tit. "Office," K 2.) It cannot be presumed that our Constitution makers would deliberately change so salutary a rule, or in any manner abridge its utility, by withdrawing necessary powers from

the Courts of justice. As if the Marshal of the King's Bench refuse or neglect to attend the Court. (Id.)

Or if he commits a misdemeanor contrary to the nature of his office, as if a jailer of a prison is guilty of extortion. (5 Comyn's Dig., "Office," K 3.) Or suffers voluntary escapes. (See id., and other cases there cited.)

How forfeiture taken advantage of: First, by *scire facias* to repeal his patent. (Comyn's Dig., "Office," K 11.) Second, by inquisition of office, and upon such inquisition returned, the King may seize the office without *scire facias*. Third, by information. (5 Comyn's Dig., "Office," K 13; *Sir George Reynel's Case*, 9 Coke, 94 b; *Rex* v. *Esten*, 2 Dyer, 197 b; 6 Coke, 50.)

It is laid down in general that if an officer acts contrary to the nature and duty of his office, or if he refuses to act at all, then in all these cases the office is forfeited. (7 Bacon's Ab., Title "Office," M, and cases there cited.)

There can be no doubt that all officers, whether so by common law or by statute, are punishable for corruption and oppressive proceedings, by indictment, attachment, action at the suit of the injured party, loss of their offices, etc. (7 Bacon's Abridgement, Title "Office," N.)

Whenever an Act of the Legislature creates an office unknown before, the officer appointed to fill the place is subject to the control of the supreme tribunals of justice, and may be punished for misbehavior, etc. (*Getee* v. *Commissioners*, 1 Bay, 354.)

Such being the common law upon official misconduct, it remains to examine whether our Constitution has done anything to relieve the parties, or to change or impair the jurisdiction and powers of the Courts of law.

The Constitution of this State is a limitation of power, and not a grant. (*Hobart* v. *Supervisors of Butte County*, 17 Cal. 23; *Smith* v. *Judge of Twelfth District*, id. 547; *State* v.

*Rogers*, 13 Cal. 158; *Thompson* v. *Williams*, 6 Cal. 88; Smith's
Const. Law, 312; 313.)

The District Courts, but for that limitation, would have
like jurisdiction with the common law Courts of Westminster
Hall in matters civil and criminal, according to the law, and
would have, at the same time, equity jurisdiction coexten-
sive with that exercised by the High Court of Chancery.

The jurisdiction of the State Courts does not depend upon
the personal quality of the parties, as does the jurisdiction
of the United States Courts of general jurisdiction, but
the State Courts are Courts of general resort to all per-
sons.   It is the subject matter of the controversy that
must be looked to, and not the person of the suitor.   Nor
do the forms provided by the Legislature for carrying on
suits have any bearing upon jurisdiction.   So long as the
form of an action violates no constitutional right (as that of
trial by jury, or the like), such forms must be within the
province of the Legislature to vary and settle at its pleasure.

The subject matter of this suit is the dispossession or
ouster of a public officer from his office for willful violation
and neglect of the duties thereof.   If this could be enter-
tained by the common law Courts in any form, then our
Legislature can prescribe the practice, and the Courts of
general jurisdiction can deal with it and enforce such process.

Respondent's counsel argues that this is not an equity case,
and in support of the assertion enumerates the various heads
or subjects of equity jurisdiction, fraud, accident, etc., show-
ing that this was within none of them.   Also, that this is
not a criminal proceeding, because the Act expressly declares
it to be a civil proceeding.   Being none of these, it is a
special proceeding unknown to the common law, and must
go to the County Court.

Against this most narrow view of the law, I answer that
this Court, beginning notably with *Conant* v. *Conant*, 10
Cal. 253, has steadily and continuously set its face.   Indeed,

Judge FIELD in that case enumerated as one of the subject matters of jurisdiction "honorary officers without salaries." Surely the right to an office of trust and public importance, with a salary, must apply with greater force. If Mr. Marks, instead of the State, claimed possession of this office, it will hardly be contended that he could not come into the District Court with his suit. So could another claiming it for himself by virtue of paramount title. But because it is sought to be recovered from the respondent, because of his gross violation of the condition of his title thereto, and for the benefit of the people, it is claimed that the District Court is incompetent to deal with the matter.

The District Court may issue the writs of mandamus, certiorari, and prohibition, although neither of these writs is given it in terms by the Constitution. (*Perry* v. *Ames*, 26 Cal. 372; *Courtright* v. *Bear River Co.*, 30 Cal. 573.)

If the District Courts can issue these writs, they can also, by the same reason, issue the writs of quo warranto and *scire facias*, or any substitute for them, or modification, not in violation of any of the constitutional rights of individuals.

I hold this to be a simple but unanswerable proposition, that any wrong or other subject matter of judicial proceedings that the King's Courts at Westminster could have taken cognizance of and redressed by virtue of their inherent jurisdiction, that then, in the absence of Constitutional inhibition, our District Courts may do the same. And further, that the forms of practice by which that jurisdiction is operated are within the legitimate control of the Legislature, and may be changed and modified without affecting the jurisdiction. And this is what has been done. The District Court, in the absence of Practice Acts and special statutes, would have dealt with the case at bar by quo warranto or *scire facias* at the suit of the Attorney General for the people. (5 Comyn's Dig., Tit. "Officer;" Bouv. Law Dict., Articles "Quo Warranto," and "Scire Facias;" 3 Black. 263;

2 Kent, 312; 1 Serg. & Rawle, 382; Bacon's Ab., Tit. "Scire Facias;" id., Tit. "Office.") But most names of writs and all forms of action have been changed, and one form of action alone remains.

The Act provides "that whenever any complaint in writing, verified by the oath of any complainant, shall be presented to the District Court, alleging that any officer, etc., has refused or neglected to perform the duties pertaining to his office, as prescribed by law, it shall be the duty," etc. The word complaint signifies " one who complains." (Bouv. Law Dict.) We call special attention to the word complaint as defined in section one hundred and one of the Criminal Practice Act. As for the word complainant, it is equivalent to the word prosecutor. (See Crim. Practice Act, Sec. 609, Hittell Dig. 2196.)

It does not require or even hint of any special injury to the complainant or to anybody, as a condition to the proceeding. It does not hint of the necessity of a demand, or refusal, or of the intervention of another party than the officer himself, to make his default, delinquency, or forfeiture complete.

It is also contended by respondent that the Act of 1853 has been by implication repealed by subsequent legislation, and especially by the Act of 1855, pages 81–99, regulating fees in office. To this there are several answers, all conclusive of the point:

First—The Act regulating fees is specially restricted to the officers named therein, and the Harbor Commissioner is not among those specified.

Second—It only applies to extortion of illegal fees, and extends to no other official misconduct.

Third—As to extortion of illegal fees, it does not repeal the Act of 1853, or any Act furnishing any other remedy, but only furnishes a cumulative one.

The rule as to cumulative remedies or punishments is most clearly laid down in *Rex* v. *Robinson*, 2 Burrows, 803, where Lord MANSFIELD says the rule is certain "that when a statute creates a new offense by prohibiting and making unlawful anything that was lawful before, and providing a specific remedy against said officer by a particular method, that particular sanction or method must be pursued and no other." "But where the offense was antecedently punishable at common law, and then a statute provides a new plan, then either way may be taken, and it is merely cumulative." (2 Bur. 803; *Reed* v. *The Omnibus Railroad Co.*, 33 Cal. 212; 5 Hill, 221; 9 Cowen, 506.) Repeals by implication are not favored. (1 Bish. Crim. Law, 197; Sedgwick on Stat. 126; 28 Cal. 554; 13 Wend. 341; 17 N. Y. 516.) This Court has once sustained the proceeding under the statute of 1853 as constitutional, though not upon the points urged by the respondent. (*Ryan* v. *Johnson*, 5 Cal. 86.)

*Hall McAllister*, for Respondent.

Constitution of California, Article six, section six, says: "The District Court shall have original jurisdiction in all cases in equity; also, in all cases at law which involve the title or possession of real property, or the legality of any tax, impost, assessment, toll, or municipal fine, and in all other cases in which the demand, exclusive of interest or the value of the property in controversy, amounts to three hundred dollars; and also in all criminal cases not otherwise provided for." (1 Hitt. Art. 178.)

CASES IN EQUITY.—What are cases in equity? To ascertain this we must look to the jurisdiction of the High Court of Chancery in England. (*People* v. *Davidson*, 30 Cal. 390, 391.)

Article third, section two, of the Constitution of the United States says: "The judicial power shall extend to all cases in

law and equity arising under this Constitution, the laws of the United States, and treaties," etc.   (1 Hitt. Art. 26.)

Under this clause the construction is, that we must look to the common law to ascertain what are " cases in law and equity."   (2 Story on Const. Art. 1645.)

Heads of equitable jurisdiction are:

First—Matters of trust and confidence, which involve (a) uses and trust, (b) administration of estates, (c) charities, (d) separate estates of married women, (e) mortgages.

Second—Infants and lunatics.

Third—Fraud, accident, or mistake.

Fourth—Cases where equity furnishes a more effectual remedy: (a) Delivery of specific chattels, (b) specific performance, (c) partners.

Fifth—Cases where remedy at law is difficult or hazardous: (a) Account, (b) set-off, (c) tithes, (d) dower, (e) partition, (f) conflicting boundaries.

Sixth—To prevent a multiplicity of suits: (a) Suits to establish a general right, (b) suits to quiet title, (c) suits of interpleader.

Seventh—As to contribution between sureties.

Eighth—Its protective and preventive jurisdiction: (a) Injunctions, (b) receivers.

Ninth—Assistant jurisdiction: (a) Discovery, (b) production of documents, (c) perpetuation of testimony. (1 Spence's Equitable Jur. 431, 433.)

This proceeding comes under no head of equitable jurisprudence—" is not a case in equity."

CASES AT LAW.—These are divided by the Constitution of California into three classes:

(a) " Cases at law which involve the title or possession of real property."

(b) Cases at law which involve " the legality of any tax, impost, assessment, toll, or municipal fine."

(c) "All other cases in which the demand, exclusive of

interest, or the value of the property in controversy, amounts to three hundred dollars." That is, cases for money demands.

ALL CRIMINAL CASES NOT OTHERWISE PROVIDED FOR.— Under which one of these several clauses will the plaintiff bring this case?

Clearly, under the Constitution, the District Court had no jurisdiction of this case as a civil action.

This is not "a criminal case." The form and mode of proceeding is not criminal. The Act of 1853 speaks of it as governed by the rules of practice of District Courts in "civil cases." (Stats. 1853, p. 41, Sec. 6.)

This is a special statutory proceeding—one entirely unknown to the common law. At common law the mode of removal from office, or forfeiture of office, was by quo warranto or *scire facias*, at the suit of the King, or by indictment. (3 Blackstone Com. 263; 2 Chitty's Black. 201, 202; 7 Bacon's Abridg. 322.)

Of course, at common law, a writ of *scire facias* could be sued out by a private person, for certain purposes, but never to repeal letters patent, or remove from office. (2 Tidd's Practice, 1091.)

This is manifestly a special statutory proceeding; if so, what Court, according to the Constitution of California, is entitled to jurisdiction over it? Clearly the County Court, and only the County Court.

The Constitution of California, Article VI, section eight, says: "The County Courts shall have original jurisdiction of actions of forcible entry and detainer, of proceedings in insolvency, of actions to prevent or abate a nuisance, and of all such special cases and proceedings as are not otherwise provided for ; and also such criminal jurisdiction as the Legislature may prescribe." (1 Hittell, Art. 180.) The first Constitution of California provided: "The County Courts shall have such jurisdiction in cases arising in Justices' Courts, and in special cases, as the Legislature may

prescribe, but shall have no original civil jurisdiction, except in such special cases." (Wood's Digest, 33.) This clause in the first Constitution of California is copied verbatim from the Constitution of New York. Our argument is much stronger under the amended Constitution of California than under its first Constitution.

Decisions as to special cases under old California Constitution: (1855.) (*Parsons* v. *Tuolumne Water Co.*, 5 Cal. 43, 44.) Special cases: "Such new cases as are the creation of statutes and proceedings, which are unknown to the general framework of Courts of common law and equity." (1859.) (*Saunders* v. *Haynes*, 13 Cal. 150, 151, 152, 155.) (1855.) (*Kundolf* v. *Thalheimer*, 2 Kernan, 595, 596, 597.) (1862.) (*Ricks* v. *Reed*, 19 Cal. 551, 572, 564.) This was the decision of the Courts when the amendment to the Constitution was passed. That amendment made the argument still stronger.

The first Constitution said: "And in special cases, as the Legislature may prescribe." The second Constitution: "And of all such special cases and proceedings as are not otherwise provided for." That is, not otherwise provided for by this Constitution.

The statute of March 14th, 1853, has no application to the case made in the complaint.

This is a very crude statute. It was passed in the early days of California legislation; probably the creation of some member of the Legislature who had suffered from the high fees then allowed to Sheriffs, County Clerks, etc. Its general language applies to every office, whether State, district, city, or township. If we were to give to its general words full force, then the Governor and Supreme Judges could be summarily removed by any District Judge, under this statute, for neglect to perform any "judicial act," however insignificant.

Article four, section nineteen, of Constitution of California,

provides: "The Governor, Lieutenant Governor, Secretary of State, Controller, Treasurer, Attorney General, Surveyor General, Justices of the Supreme Court, and Judges of the District Courts, shall be liable to impeachment for any misdemeanor in office." (1 Hittell, Art. 131.) So that it will not do to give the general words of this statute full force.

Suppose a Coroner neglects to decently inter a dead body (1 Hittell, 744), is he, without request, liable to removal under this Act? The word refusal involves request. No request alleged here.

The usual writ to enforce the performance of official duty is a writ of mandamus (Practice Act, Secs. 466, 467), "to compel the performance of an act which the law specially enjoins as a duty resulting from an office, trust, or station." But what is a condition precedent to every mandamus? Why, always, that the performance has been requested and refused. (*People* v. *Romero*, 18 Cal. 91, 92; *Crandall* v. *Amador County*, 20 Cal. 75; Addison on Torts, 1067.)

Can a man lose his office for neglecting to perform some particular official act, yet to enforce performance by a command, mandamus requires as a condition precedent a distinct demand of the particular act which the party desires to have performed, and a refusal?

Is it possible that any general misfeasance, or malfeasance, or nonfeasance, are embraced by this Act—that it covers bribery, embezzlement, and conspiracy?

The plaintiff has not the legal capacity to sue in this action; said plaintiff is not the real party in interest; on the contrary, plaintiff has no interest. The people of the State of California are the real parties in interest. (Stat. March 14th, 1853, Sec. 4; Stats. 1853, p. 41.) "Whenever any complaint in writing, duly verified by the oath of any complainant." Lauren E. Crane is not a complainant. The legal idea of a complainant is not only one who complains, but, also, one who has a right to complain.

This is a civil action. Practice Act, Sec. 2: "In such action the party complaining shall be known as the plaintiff." Practice Act, Sec. 4: "Every action shall be prosecuted in the name of the real party in interest." Sec. 6 of Act 1853: "Rules of practice governing District Courts in civil cases shall be in force in all proceedings under this Act." (Stats. 1853, p. 41, Sec. 6.) Complainant is the term used in equity as a synonym for plaintiff. Generally plaintiff is used in our statutes, but sometimes complainant. Forcible Entry Act of 1850, Sec. 9: "On the trial the complainant shall only be required to show," etc; Section 12: "In all cases of a verdict by the Justice or jury for the complainant," etc. (Stats. 1850, p. 426.) With us the complainant, or the plaintiff, is the real party in interest. If one man has been charged an illegal fee, can fifty men become complainants under this statute?

Lauren E. Crane has no rights to redress in this action. There is no allegation that the defendant ever extorted illegal fees from him, Crane, or that plaintiff ever refused or neglected to perform any official act, in the performance of which Crane had an interest, or which Crane had requested him to perform. (*People* v. *Pacheco*, 29 Cal. 210; *Doolittle* v. *Supervisors Broom County*, 18 N. Y., 4 Smith, 157; *Roosevelt* v. *Draper*, 23 N. Y., 323; *People* v. *Halsey*, 37 N. Y., 348; *Linden* v. *Board of Supervisors, etc.*, ante, p. 6.)


By the Court:

The complaint here was filed in the District Court of the Nineteenth Judicial District by L. E. Crane, under the provisions of the Act of March, 1853, " to prevent extortion in office and enforce official duty." (Acts. 1853, p. 40.) It alleges that Marks holds the office of State Harbor Commissioner, and that he has neglected to perform the duties of his office—some sixteen specifications of such, his alleged

neglect, being set forth. Upon demurrer filed by Marks, the Court below gave judgment dismissing the proceedings, and from this judgment this appeal is brought.

1. There can be no doubt that the case made by the complaint is one directly within the provisions of the Act of 1853 (p.*40). That Act was designed to afford a remedy of a summary character against officeholders who were guilty of extortion or of *neglect in the performance of official duty*, and the case of Marks is brought by the complaint within the latter category.

2. It is clear, too, that the Act of 1853 has not been repealed, but is still in force.

3. There is nothing, either, in the Act which requires that Crane, who preferred this complaint, should aver or prove that he is a party in interest in the strict sense, or has himself sustained any special damage by reason of the official neglect complained of. The purpose of the statute was the wholesome one of authorizing any person who would take the duty upon himself to institute an inquiry into the conduct of certain public officers in the manner pointed out. It is not the personal interest of the complainant which the statute regards, but the higher and more important interest of the people and the body politic in the honest and faithful discharge of official duties by public servants. The right of a private person to institute an inquiry into the conduct of officeholders under the Act in question may be said to be akin to the right of every elector to contest the claim of any person asserting himself to have been elected to office—to the nature and purpose of which latter we had occasion to refer in *Minor* v. *Kidder*, 43 Cal. 229.

The third section of the Act of 1853 is in the following words: "Sec. 3. The District Courts shall have jurisdiction of all cases arising under this Act."

It is claimed by the respondent that it was not competent to the Legislature to confer this jurisdiction upon those

Courts.   The argument in support of this proposition is rested by counsel upon the clauses of the Constitution by which the jurisdiction of the District Courts and of the County Courts are respectively defined, and it is thereupon claimed that this case is a *special case or proceeding*, and is, therefore, necessarily cognizable only in the latter Courts. But even if it were in itself such special case, it is also, as we have already seen, a special case, the jurisdiction over which has been otherwise provided for, and is, for that reason, not a case within the rightful jurisdiction of the County Court.   In the eighth section of the sixth Article of the Constitution, defining the jurisdiction of the County Courts, it is provided that those Courts shall have jurisdiction " of all such special cases and proceedings as are not otherwise provided for," etc.   It is, therefore, practically left to the legislative will to determine whether the jurisdiction over any given special case, or number of special cases, shall be vested in the County Court or some other Court, and in this instance the jurisdiction has been in express terms conferred on the District Court.   But our judgment here proceeds upon·grounds wholly apart from the consideration of whether the case in hand can be fairly brought within the definition of a special case or not.   It is provided in substance in the Act of 1853 that any person holding any office in this State who shall neglect to perform his official duty according to law shall be deprived of his office.   So far the Act is certainly only declaratory of the common law; for neglect of official duty amounted at common law to an impeachable misdemeanor in office, and, upon conviction, the officer might be removed.   (1 Story on the Constitution, Sec. 800.)   The Constitution of this State (Art. IV) undertook to distribute this power to remove public officers for misdemeanor in office—of which, as we have said, neglect of official duty

was one. It, for this purpose, placed the Governor, Lieutenant Governor, Secretary of State, Controller, Treasurer, Attorney General, Surveyor General, Justices of the Supreme Court, and District Judges in one class, and placed all other civil officers in another class; it then provided that those of the first class should be liable to impeachment—(that is, to be accused by the Assembly and tried by the Senate) for any misdemeanor in office (Sec. 18), and that those of the second class should "be tried for misdemeanor in office *in such manner as the Legislature may provide.*"    (Sec. 19.)

The Act of 1853 does provide how—in what manner—upon what procedure—in what Court—officers, not of the first class, shall be tried for that misdemeanor in office known at common law, and recognized in this statute as neglect of official duty. The power of the Legislature to enact such a statute (under the latter clause of Sec. 18) is plain—as obvious as is the power of the Assembly to prefer and that of the Senate to try articles of impeachment under the first clause of the same section.

The power to remove *certain* officers for misdemeanor in office is exercised only by the Assembly and Senate under the name of *impeachment*—the like power to remove *all other officers* under like circumstances and for like causes is to be exercised "*in such manner as the Legislature may provide.*" (Sec. 19.) The power to provide the manner in which a delinquent is to be tried in the second case is on a footing with the power to directly remove the delinquent by the judgment of the Senate in the first case.

When, therefore, the Legislature, pursuant to this clause of the Constitution, conferred the power upon the District Courts to try the delinquents of the second class, the power of those Courts was not at all referable to the sixth article of the Constitution, defining the judicial power, and hence an argument against the jurisdiction of the Court, drawn from a consideration of that article, is of no more force than

if addressed to the Senate upon a trial of impeachment. It is the exercise by the District Court of the power to remove from office, upon conviction had, which is in fact the power of impeachment, and is impeachment in every respect, except the mere form of procedure pursued.

The Assembly is not, indeed, the accuser, nor does the Senate try the accusation. The Legislature has substituted a private citizen, it may be, instead of the one, and the District Court in the place of the other. The substance of the judgment to be entered in case of conviction is prescribed, and the rules of practice governing in civil cases are to be applied, and the benefit of an appeal secured. These make up the manner in which the trial is to be had.

We, therefore, think that it was the duty of the Court below in this case to have entertained the proceedings against Marks; and its judgment must be reversed, and the cause remanded, with directions to overrule the demurrer, and for further proceedings.